

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-23-00011-CR

MICHAEL SHANE POWELL, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 102nd District Court
Red River County, Texas
Trial Court No. CR03349

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

# MEMORANDUM OPINION

A Red River County jury convicted Michael Shane Powell of aggravated assault with a deadly weapon and sentenced him to twenty years' imprisonment. *See* TEX. PENAL CODE ANN. § 22.02 (Supp.). On appeal, Powell argues that (1) the evidence was insufficient to support the jury's verdict of guilt, (2) the trial court should have conducted an inquiry into his competence to stand trial, (3) his counsel rendered ineffective assistance, and (4) the record does not support all the court costs assessed against him.

We find that sufficient evidence supports the jury's finding of guilt and that an informal inquiry into Powell's competence was not required. We also find that Powell cannot prove his allegations of ineffective assistance on this silent record and that all the costs assessed against Powell were proper. Accordingly, we affirm the trial court's judgment.

## I. Factual and Procedural Background

The State alleged that, in December 2021, Powell intentionally or knowingly threatened Kristopher Posey with imminent bodily injury by shooting a firearm at or in his direction. Powell pled not guilty to that allegation. The evidence at trial established that the shooting happened just outside of Powell's home. Powell's neighbors, including Posey, William Gilbert, Dustin Gilbert, and Casey Townes, testified against him.

William's and Posey's testimony established that Powell was known to yell at his neighbors for no reason. William said that, when William's family would enjoy their yard, Powell would "act[] . . . just crazy" and would even yell at children. William explained that Powell would "come out and be yelling, telling [them] to get back in [their] house and stuff like

2

that and cussing." When asked about what Powell would yell, William said he would "just be screaming at [them]." He continued, "I mean, just random things. Why? Who knows. . . . [H]e'll just come out screaming and everybody will be like what's wrong and we're like we don't know." Posey also testified that he was "worried about [his] kids because there w[ere] some days [Powell] would walk outside and be hollering at [them] for no reason." According to William, others had told him that Powell had fired weapons in his yard before the December 2021 incident.

William's son, Dustin, said the incident occurred after another neighbor had been recently robbed. According to Dustin, Posey approached him to see if they should investigate a suspicious vehicle parked nearby in hopes of obtaining any information about the robbery. Dustin, Posey, William, and Dustin's younger brother approached the car. As they neared the vehicle, Dustin testified that Powell came out of his home with a long-barrel gun and began screaming and cursing at the group. Dustin testified that, from twenty feet away, Powell fired the gun "a[t] [their] general area" and "hit the tree where [they] were standing," terrifying the group. Dustin clarified that the tree was three or four feet away from him.

According to William and Posey, Dustin notified them that Powell had a gun. William said that, by the time he "turned to look[, the gun] went off[,]" and the shot "cracked the tree" "[t]o the left of [him] where [he] was standing." Posey testified that Dustin said Powell had a gun "pointed at [them]" and that "it wasn't a few seconds later [they] hear[d] a gunshot" that "[h]it the tree behind [them]."

3

Dustin and William both said that the group retreated towards a neighbor's house, but Powell, who had run back into his house after firing the long-barrel gun, came back outside with a pistol, waived it at the group, and told them they would "sign . . . death warrants" if they called the police. Posey also testified that Powell returned from his house after retrieving a pistol that he waived at them, which prompted the group to run to Posey's house. Townes, who heard the gunfire from inside of her home, called 9-1-1. She then called Posey, who told her that Powell "shot at [them]."

James Melton, an officer from the Red River County Sheriff's Office, testified that he was dispatched to Powell's residence. Melton, Dustin, William, and Posey all testified that Powell threw a beer bottle at Melton, which shattered on the road. Melton said that Powell, who was holding a gun, barricaded himself inside of his home and refused to come out. According to Melton, officers tried to communicate with Powell for about four hours and waited for Powell's mother, Kay Lacy, to travel from Little Rock, Arkansas, to assist them.

Lacy testified that Powell was an electrician until he suffered, six years earlier, a traumatic brain injury that required medication administered under his doctor's care. Lacy explained that Powell was unemployed at the time of trial because his "mind [would not] let him" work. She also testified that Powell heard voices and clarified that Powell was never a Marine, although he believed himself to be one. Lacy testified that "nine times out of ten," people could not "tell that [Powell] ha[d] a problem except if he start[ed] thinking about child molesters and stuff like that he [got] mad and when he start[ed] yelling [it was] not at the person." Lacy said Powell "had good cognitive recognition," paid his bills, and knew right from

4

wrong, "[e]xcept if [he was] in a manic state," which meant "you [could not] talk to him or he [did not] know [what was being said]." Lacy knew that Powell's neighbors did not like him, but she could only check on Powell by phone because she had to stay at home with her disabled husband.

Lacy testified that she believed Powell was in a manic state during the incident. A recording of the incident showed that Lacy was on a bullhorn in front of Powell's home in an effort to get him out of the house. Samantha Sellers, an investigator with the Red River County Sheriff's Department who was at the scene, said that Lacy "made mention that a good Marine would come on out," and the recording of the incident confirmed that. On the recording, Sellers indicated that Powell was on medication and opined that he might be hard to wake as a result. The recording also showed that Powell eventually opened the door, waved, but became argumentative after doing so. Powell ranted, raved, cussed, and told officers that he was a Marine and that they needed to contact the Department of Defense. Sellers testified that officers had to physically restrain and tase Powell before handcuffing him. Officers confiscated a shotgun and handgun from Powell.

During the State's closing argument on guilt/innocence, the State said, "[Powell has] a brain injury supposedly and [Lacy] says, well, he goes in these manic states and he's fine when he's not, but can we afford to have him out there on the times when he goes into a manic state." The State argued that Powell knew right from wrong. In response, Powell's counsel argued, "We see a man with a mental illness and he's having a manic episode. . . . He doesn't know what's going on and he acts the way he does."

5

After hearing the evidence and arguments of counsel, the jury found Powell guilty of aggravated assault with a deadly weapon.

At punishment, the State introduced Powell's prior offenses, including a 1995 driving while intoxicated (DWI) conviction, a 2005 DWI conviction, a 2005 violation of implied consent to a breath test conviction, and a 2018 disorderly conduct conviction. Powell presented no evidence at punishment.

During the State's punishment closing argument, the State argued that Powell was dangerous because "apparently he doesn't take his medication . . . . And we have a place where we can keep him and they'll send him to diagnostics down at [the] [Texas Department of Corrections] and they'll put him in a place to where he can be medicated and controlled." The State continued, "We see it all the time on TV. People go into schools shooting up schools or people going to a mall and shooting up a mall. Those folks all have problems. Well, this guy has problems, you've seen it, he has already started it." The State continued, "[H]eaven help us if a kid next week gets shot when [Powell] goes to Wal-Mart and buys another shotgun or wherever you can go, Academy, and get a shotgun and he ends up shooting somebody when he goes into one of his manic states." In his punishment closing, Powell's counsel discussed Powell's "mental illness" and said, "Powell . . . needs help, he hears voices." Defense counsel urged the jury to place Powell on community supervision. In rebuttal, the State urged the jury to assess the maximum twenty-year sentence, adding, "He can get a knife. He can slit his mother's throat." Agreeing with the State, the jury assessed the maximum twenty-year sentence.

## II.	The Evidence Was Legally Sufficient to Support the Jury's Verdict of Guilt

In his first point of error, Powell argues that the evidence was legally insufficient to support the jury's finding of guilt.  We disagree.

### A.	Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)).  "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)).  "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).  "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of

7

proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

Here, the State alleged that Powell intentionally or knowingly threatened Posey with imminent bodily injury by shooting a firearm at or in his direction. In his brief, Powell says he "does not challenge the evidence that he was the actor and that he discharged a weapon." Instead, he complains that the weapon was not discharged "'at or in the direction of' Kristopher Posey because the evidence on this element was very general in nature."

**B.     Analysis**

We find that there is ample evidence to show that Powell discharged a firearm in Posey's direction. Dustin testified that Powell fired a bullet that hit the tree close to where he, William, and Posey were standing. When asked if Powell shot a firearm in his direction, Posey answered, "Yes." He added that he felt threatened with imminent bodily injury and that the shot "[h]it the tree behind [them]." According to Townes, Posey told her over the phone that Powell "shot at [them]." As the fact-finder, the jury was entitled to believe that testimony.

When viewed in the light most favorable to the jury's verdict, the evidence was sufficient to support the jury's finding, beyond a reasonable doubt, that Powell discharged a weapon in Posey's direction. As a result, we overrule Powell's legal sufficiency challenge.

**III.     A Sua Sponte Inquiry Into Powell's Competence Was Not Required**

In his second point of error, Powell argues that the trial court should have conducted an informal inquiry into his competence in light of the evidence of his mental illness. We conclude

that, on this record, the trial court did not abuse its discretion by failing to conduct an informal inquiry into Powell's competence to stand trial.

### A.    Standard of Review

"We review a trial court's failure to conduct an informal inquiry into appellant's competency for an abuse of discretion." *Lindsey v. State*, 544 S.W.3d 14, 21 (Tex. App.— Houston [14th Dist.] 2018, pet. ref'd). Under this standard, we do "not substitute [our] judgment for that of the trial court, but rather determine[] whether the trial court's decision was arbitrary or unreasonable." *Montoya v. State*, 291 S.W.3d 420, 426 (Tex. Crim. App. 2009), *superseded by statute on other grounds, as recognized in Turner v. State*, 422 S.W.3d 676, 692 (Tex. Crim. App. 2013).

### B.    Relevant Caselaw

"As a matter of constitutional due process, a criminal defendant who is incompetent may not stand trial." *Clark v. State*, 592 S.W.3d 919, 924 (Tex. App.—Texarkana 2019, pet. ref'd) (quoting *Boyett v. State*, 545 S.W.3d 556, 563 (Tex. Crim. App. 2018)). "Although a defendant is presumed competent and bears the ultimate burden of proving incompetence to stand trial," the Texas Code of Criminal Procedure "does not allow a trial court to stand by and wait for a defendant to raise the issue." *Id.* at 925. "Rather, in order to ensure that no incompetent defendant is put to trial, Article 46B [of the Texas Code of Criminal Procedure] places certain responsibilities on the trial court to inquire into the matter independently and force the parties to litigate the issue, if necessary." *Id.* (citing TEX. CODE CRIM. PROC. ANN. arts. 46B.003(b), 46B.004(a), 46B.005(a)).

9

"Texas' competency statutes allow competency to be raised, by either party or the judge, at any time before sentence is pronounced." *Morris v. State*, 301 S.W.3d 281, 290 (Tex. Crim. App. 2009). "Procedurally, a trial court employs two steps for making competency determinations before it may ultimately conclude that a defendant is incompetent to stand trial." *Boyett v. State*, 545 S.W.3d at 556, 563 (Tex. Crim. App. 2018). "The first step is an informal inquiry; the second step is a formal competency trial." *Id.*

Article 46B.004(b), describes how the informal inquiry can be triggered. It states, "If evidence suggesting the defendant may be incompetent to stand trial comes to the attention of the court, the court on its own motion shall suggest that the defendant may be incompetent to stand trial." TEX. CODE CRIM. PROC. ANN. art. 46B.004(b). "On suggestion that the defendant may be incompetent to stand trial, the court shall determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial." TEX. CODE CRIM. PROC. ANN. art. 46B.004(c).

Because "[a]n informal inquiry is called for upon a 'suggestion' from any credible source that the defendant may be incompetent," *Boyett*, 545 S.W.3d at 563 (quoting TEX. CODE CRIM. PROC. ANN. art. 46B.004(a), (c), (c-1)), "[t]he amount of information necessary to trigger an 'informal inquiry' is low," *Clark*, 592 S.W.3d at 925 (quoting TEX. CODE CRIM. PROC. ANN. art. 46B.004(a), (c), (c-1)). "Evidence suggesting the need for an informal inquiry may be based on observations made in relation to one or more of the factors described by Article 46B.024 or on any other indication that the defendant is incompetent within the meaning of Article 46B.003." TEX. CODE CRIM. PROC. ANN. art. 46B.004(c-1). "A further evidentiary showing is not required

to initiate the inquiry, and the court is not required to have a bona fide doubt about the competency of the defendant."[1] *Id.*

> Under Article 46B.024,
>
> considerations include information regarding whether the defendant has a mental illness or an intellectual disability, "whether the identified condition has lasted or is expected to last continuously for at least one year," whether medication is necessary to maintain the defendant's competency, and "the degree of impairment resulting from the mental illness or intellectual disability . . . and the specific impact on the defendant's capacity to engage with counsel in a reasonable and rational manner."

*Laflash v. State*, 614 S.W.3d 427, 432 (Tex. App.—Houston [1st Dist.] 2020, order) (quoting TEX. CODE CRIM. PROC. ANN. art. 46B.024(2)–(5)); *see Lampkin v. State*, 470 S.W.3d 876, 908 (Tex. App.—Texarkana 2015, pet. ref'd).[2] Under Article 46B.003, a defendant is incompetent to stand trial if he does not possess "sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding." TEX. CODE CRIM. PROC. ANN. art. 46B.003(a)(1). Evidence of "recent severe mental illness, at least moderate retardation, or truly bizarre acts by the defendant" are sufficient to trigger a competency inquiry. *McDaniel v. State*, 98 S.W.3d 704, 710 (Tex. Crim. App. 2003) (quoting *Alcott v. State*, 51 S.W.3d 596, 602 (Tex. Crim. App. 2001) (Price, J., concurring)).

---

[1]During the informal inquiry, "a trial court must consider only evidence of incompetency, and it must not weigh evidence of competency against the evidence of incompetency." *Boyett*, 545 S.W.3d at 564.

[2]The term "'[m]ental illness' means an illness, disease, or condition, other than epilepsy, dementia, substance abuse, or intellectual disability, that grossly impairs: (A) a person's thought, perception of reality, emotional process, or judgment; or (B) behavior as demonstrated by recent disturbed behavior." TEX. CODE CRIM. PROC. ANN. art. 46B.001(12) (Supp.).

### C. Analysis

Here, there was no evidence of moderate retardation or bizarre acts by Powell in the trial court's presence. As for evidence of mental illness, there was evidence that Powell suffered from a traumatic brain injury, had been under a doctor's care for six years preceding trial, and required medication for mental illness. Powell's neighbors testified about his "crazy" behavior, including throwing a beer bottle at a police officer, and Lacy's testimony established that Powell, a former electrician, was unable to work after his head injury, heard voices, and could become manic. The evidence also showed that Powell falsely claimed that he was a Marine. Even the State's closing arguments during punishment referred to Powell's mental illness. Yet, nothing suggested that Powell's mental illness was severe or that Powell was experiencing any effects that would impact his competency.

As for whether Powell was able to consult with counsel with a rational degree of understanding, Powell points to the following portion of the transcript to suggest the possibility of confusion as to whether he would testify:

> [POWELL'S COUSEL]: Additionally, Your Honor, the defense -- Mr. Powell has been advised of his rights to testify and all the pitfalls that go with it along with the good and he has decided at this time he does not wish to testify in the guilt/innocence phase of his trial. Is that correct, Mr. Powell?
>
> MR. POWELL: Do what now?
>
> [POWELL'S COUSEL]: You don't want to testify at this time?
>
> MR. POWELL: If somebody has questions they want to ask me, I'll be more than happy to testify. I guess no.

12

[POWELL'S COUSEL]: My client does not wish to testify at this time, Your Honor . . . .

We disagree with Powell's assertion that this portion of the transcript was sufficient to show confusion or inability to communicate with his counsel. Instead, it showed that Powell knew that testifying would require him to answer questions and that he ultimately agreed with his counsel's suggestion—apparent in counsel's questions to Powell—to refrain from providing testimony. We also note that there were four pretrial hearings and voir dire prior to the exchange reported above, and the record does not indicate that Powell exhibited confusion or inappropriate behavior during those proceedings.

In *Turner*, the Texas Court of Criminal Appeals noted that "[t]he fact that a defendant is mentally ill does not by itself mean he is incompetent," and we find that the record in Powell's case shows nothing more than that he was mentally ill at some time. *Turner*, 442 S.W.3d at 691. It is only "when a defendant's mental illness operates in such a way as to prevent him from rationally understanding the proceedings against him or engaging rationally with counsel in the pursuit of his own best interests" that "he cannot be made to stand trial consistent with due process." *Id.* To suggest incompetency, the record would need to show that the mental illness prevented appellant from rationally understanding the proceedings against him or engaging with counsel to pursue his best interests. *Lindsey*, 544 S.W.3d at 25 (citing *Turner*, 442 S.W.3d at 691); *see also McDaniel v. State*, 98 S.W.3d 704, 712 (Tex. Crim. App. 2003) (holding that evidence the defendant suffered bipolar disorder did not obligate trial court to make informal inquiry into defendant's competency). Simply put, nothing showed that Powell's mental illness

13

prevented his rational understanding of the proceedings or that he was not able to meaningfully engage with his counsel. As a result, we do not find that Powell met the threshold required to trigger an informal inquiry.

We conclude that, based on the record before us, the trial court did not abuse its discretion by failing to conduct an informal inquiry. As a result, we overrule Powell's second point of error.

## IV. The Silent Record Does Not Support Powell's Claim of Ineffective Assistance

In his third point of error, Powell argues that his counsel rendered ineffective assistance because he should have (a) introduced mitigating evidence during punishment, "(b) objected to the State's closing arguments, (c) raised the issue of Powell's competence in a motion for new trial, and (d) filed a suggestion of incompetence."

### A. Standard of Review

The Sixth Amendment to the United States Constitution guarantees an accused the right to reasonably effective assistance of counsel in criminal prosecutions. U.S. CONST. amend. VI; *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). We "look to the totality of the representation" in evaluating the effectiveness of counsel. *Auld v. State*, 652 S.W.3d 95, 113 (Tex. App.—Texarkana 2022, no pet.). As many cases have noted, the right to counsel does not mean the right to errorless counsel. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). "[T]o prevail on a claim of ineffective assistance of counsel, [the defendant] must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, [687–88] . . . (1984)." *Ex parte Imoudu*, 284 S.W.3d 866, 869 (Tex. Crim. App. 2009) (orig. proceeding). A failure to

14

make a showing under either prong of the *Strickland* test defeats a claim for ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003).

To prove ineffective assistance of his counsel, Powell must show (1) that trial counsel's representation fell below an objective standard of reasonableness, based on prevailing professional norms, and (2) that there is a reasonable probability that the result of the proceeding would have been different but for trial counsel's deficient performance. *See Strickland v. Washington*, 466 U.S. 468, 687–95 (1984); *Hernandez v. State*, 726 S.W.2d 53, 55–57 (Tex. Crim. App. 1986). A "reasonable probability" means a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

**B.      The Silent Record Prevents Powell from Meeting the First *Strickland* Prong**

Under the first *Strickland* prong, "the defendant must prove, by a preponderance of the evidence, that there is . . . no plausible professional reason for a specific act or omission." *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Accordingly, judicial scrutiny of counsel's performance must be highly deferential, and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). We apply a strong presumption that trial counsel was competent and presume that counsel's actions and decisions were reasonably professional and motivated by sound trial strategy. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). Also, when an appellate record is silent on why trial counsel failed to take certain actions, "the appellant has failed to rebut the presumption that trial counsel's decision was in some way—be it conceivable

15

or not—reasonable." *Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007); *see Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999).

### 1. Failing to Present Mitigating Evidence

Failure to conduct an adequate investigation may constitute ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 521–23 (2003). As the United States Supreme Court said in *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "A claim for ineffective assistance based on trial counsel's failure to investigate generally fails absent a showing of what the investigation would have revealed that reasonably could have changed the result of the case." *Guillory v. State*, 652 S.W.3d 499, 505 (Tex. App.—Houston [14th Dist.] 2022, order on reh'g) (per curiam) (citing *Stokes v. State*, 298 S.W.3d 428, 432 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd)); *see Cooks v. State*, 240 S.W.3d 906, 912 (Tex. Crim. App. 2007).

Here, "the record is silent as to what investigative steps counsel took and what conclusions he may have subsequently drawn." *Guillory*, 652 S.W.3d 505 (citing *Brown v. State*, 129 S.W.3d 762, 767 (Tex. App.—Houston [1st Dist.] 2004, no pet.)) ("We will not assume that counsel did not investigate a defense when the record is merely silent as to the depth of counsel's investigation."). "When the record is silent as to counsel's trial strategy, we may not speculate about why counsel acted as he did." *Id.* at 505–06 (citing *Rylander*, 101 S.W.3d at 110–11).

16

From this record, we do not know whether Powell's counsel failed to investigate Powell's mental health, or whether he did an investigation and made a tactical decision not to present the evidence because the records discovered contained unfavorable information. For example, Powell's traumatic brain injury could have been caused during an altercation, or his injury may not have actually been traumatic. Powell's mental health records could have revealed that he was not officially diagnosed with any mental illness or that any mental illness was brought on by drug use. In sum, counsel could have reviewed Powell's records and decided that presenting them could have further harmed Powell.

As for failing to present other mitigating evidence, it is possible that counsel conducted a reasonable investigation and determined that there was no favorable evidence to present. Counsel could have decided not to have Lacy or other family members testify during punishment because the State had some knowledge of prior bad acts committed by Powell against his family, which could have come out during the State's cross-examination. It is also possible that counsel did not put Lacy on the stand at punishment because she assisted officers in arresting Powell after the offense and might have believed that Powell would be unable to complete community supervision, making a jail sentence more appropriate.

Because we can fathom many reasons for counsel's failure to present mitigating evidence at punishment, we overrule Powell's argument on this ground of alleged ineffective assistance.

### 2. Failing to Object to the State's Closing Argument

Next, Powell complains of his counsel's failure to object to the State's closing arguments.

17

"[P]roper jury argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an argument of opposing counsel, and (4) plea for law enforcement." *Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011) (citing *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008)). Powell argues that the State veered outside the bounds of proper argument when making the following closing arguments:

- "He can get a knife. He can slit his mother's throat."

- "[W]e see it all the time on TV. People go into schools shooting up schools or people going to a mall and shooting up a mall. Those folks all have problems. Well, this guy has problems, you've seen it, he has already started it."

The State does not attempt to justify the improper arguments, but instead assumes error.

Even so, we find that counsel could have had a tactical reason not to object. An instruction to disregard generally cures error from improper argument. *See Mathis v. State*, 67 S.W.3d 918, 926–27 (Tex. Crim. App. 2002). Here, counsel could have decided that the jury was not paying much attention to the State's closing and that objecting and requesting an instruction to disregard would have further drawn the jury's attention to the State's comments. *See Lopez v. State*, 358 S.W.3d 691, 697 (Tex. App.—San Antonio 2011, pet. ref'd); *see also Ruiz v. State*, No. 06-08-00136-CR, 2009 WL 36670, at *4 (Tex. App.—Texarkana Jan. 8, 2009, no pet.) (mem. op., not designated for publication). As a result, we overrule Powell's argument on this ground of alleged ineffective assistance.

18

### 3. Failing to Raise a Motion for New Trial on the Issue of Competence/Failing to File a Suggestion of Incompetence

As for the motion for new trial, our precedent is clear that a silent record will not support an ineffective assistance claim. *Hudson v. State*, 128 S.W.3d 367, 381 (Tex. App.—Texarkana 2004, no pet.). This is because, "[w]hen a motion for new trial is not filed in a case, there is a rebuttable presumption the defendant was counseled by his or her attorney regarding the merits of the motion and ultimately rejected the option." *Id.* (citing *Oldham v. State*, 977 S.W.2d 354, 362–63 (Tex. Crim. App. 1998)). "This presumption will not be rebutted when there is nothing in the record to suggest otherwise." *Id.* (citing *Smith v. State*, 17 S.W.3d 660, 662–63 (Tex. Crim. App. 2000)). We find it possible that counsel's conversations with Powell led him to believe that Powell was competent or that Powell adamantly rejected counsel's recommendation to file a motion for new trial.

Next, the silent record disposes of the complaint regarding the failure to file a suggestion of competence since counsel could have believed that, in spite of his brain injury and mental illness, Powell had sufficient present ability to consult with him with a rational degree of understanding and had a rational and factual understanding of the proceedings against him. *See* TEX. CODE CRIM. PROC. ANN. art. 46B.003. Accordingly, we overrule this last complaint of alleged ineffective assistance.

**V.    The Fees Assessed Against Powell Were Proper**

In his last point, Powell argues that the trial court erred by ordering him to pay $290.00 in court costs and $105.00 in reimbursement fees.  Specifically, he believes that only $185.00 in court costs is supported by the record.  We disagree.

The certified bill of costs shows that the trial court imposed the following court costs:

| | |
|---|---|
| STATE CONSOLIDATED COURT COSTS | 185.00 |
| DISTRICT CLERK FEE CRIMINAL | 40.00 |
| RECORDS MANAGEMENT CRIMINAL | 22.50 |
| CLERK RECORD MANAGEMENT | 2.50 |
| COURTHOUSE SECURITY | 10.00 |
| TECHNOLOGY FEE/DISTRICT CLERK | 4.00 |
| DISTRICT COURT JURY FEE | 1.00 |
| SPECIALTY COURT (DRUG COURT) | 25.00 |
| SHERIFFS FEE CRIMINAL | 105.00 |
| | |
| TOTAL COST OF CAUSE | 395.00 |

While Powell properly agrees that the State consolidated court costs of $185.00 is correct, he challenges the remaining costs.  *See* Act of May 23, 2019, 86th Leg., R.S., ch. 1352, § 1.03, 2019 Tex. Gen. Laws 3981, 3982 (codified at TEX. LOC. GOV'T CODE § 133.102).

Until its repeal in 2019, Article 102.005 of the Texas Code of Criminal Procedure provided for a $40.00 district clerk fee, a $25.00 record management fee, and a $2.50 clerk record management fee.  *See* Act of May 27, 1995, 74th Leg., R.S., ch. 764, § 1, 1995 Tex. Gen. Laws 3969, 3969 (formerly codified at TEX. CODE CRIM. PROC. art. 102.005(a), (f)).  However, Article 102.005 was repealed by the Cost Act in 2019.  *See* Act of May 23, 2019, 86th Leg., R.S., ch. 1352, § 1.19(3), 2019 Tex. Gen. Laws 3981, 3992.

20

Article 102.017 had formerly provided for a $5.00 courthouse security fee, not a $10.00 fee. Act of May 22, 1993, 73d Leg., R.S., ch. 818, § 1, 1993 Tex. Gen. Laws 3258, 3258 (effective Sept. 1, 1993). Also, Article 102.0169 had provided for a $4.00 technology fee. However, Articles 102.017 and 102.0169 were amended by the Cost Act in 2019 to delete those fees. *See* Act of May 23, 2019, 86th Leg., R.S., ch. 1352, §§ 1.07, 1.08, 2019 Tex. Gen. Laws 3981, 3987–88.

Instead, all of those former fees were replaced by a Local Consolidated Fee, which became effective on January 1, 2020. *See* Act of May 23, 2019, 86th Leg., R.S., ch. 1352 § 1.05, 2019 Tex. Gen. Laws 3981, 3984–85 (codified at TEX. LOC. GOV'T CODE § 134.101). The local consolidated fee at the time of Powell's offense was $105.00 and was to be allocated in the following manner:

| | |
|---|---|
| (1) the clerk of the court account | 38.0953 percent; |
| (2) the county records management and preservation fund | 23.8095 percent; |
| (3) the county jury fund | 0.9524 percent; |
| (4) the courthouse security fund | 9.5238 percent; |
| (5) the county and district court technology fund | 3.8095 percent; and |
| (6) the county specialty court account | 23.8095 percent. |

*See* Act of May 23, 2019, 86th Leg., R.S., ch. 1352 § 1.05, 2019 Tex. Gen. Laws 3985. After allocating the $105.00 fee in accordance with the proper percentages, it is clear that the $40.00 district clerk fee, $22.50 records management fee, $2.50 clerk record management fee, $10.00 courthouse security fee, and $4.00 technology fee were authorized since they were incorporated into the Local Consolidated Fee by the Cost Act. Also, the math reveals that the $1.00 jury fee and the $25.00 specialty court fee were also incorporated into the Local Consolidated Fee.

21

Because the Cost Act provides for imposition of these fees, we overrule Powell's invitation to delete them.

The last item in dispute is the $105.00 sheriff reimbursement. Powell's brief simply contends that "Texas law does not currently appear to support the assessment of a Sheriffs Reimbursement Fee." Critically, Powell fails to argue about whether the record supports the assessment of this fee. Because Article 102.011 expressly provides for sheriff reimbursement fees, we overrule Powell's argument. *See* TEX. CODE CRIM. PROC. ANN. art. 102.011 (Supp.); *see also Shepard v. State*, No. 06-22-00085-CR, 2023 WL 3561037, at *10 (Tex. App.—Texarkana May 19, 2023, no pet.) (mem. op., not designated for publication); *Garrett v. State*, No. 06-23-00077-CR, 2023 WL 5605344, at *1 (Tex. App.—Texarkana Aug. 30, 2023, no pet.) (mem. op., not designated for publication).

Because the record reveals that the fees assessed against Powell were proper, we overrule Powell's last point of error.

## VI. Conclusion

We affirm the trial court's judgment.


Charles van Cleef
Justice

Date Submitted:    March 27, 2024
Date Decided:    May 16, 2024

Do Not Publish

22